# COURT OF APPEALS OF VIRGINIA

## Record No. 1119-25-3

### KEON JAMIR PALMER
v.
### COMMONWEALTH OF VIRGINIA

Present: Chief Judge Decker, Judges Raphael and White
Argued at Lexington, Virginia

Opinion Issued August 4, 2026[*]

**FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG**
J. Frederick Watson, Judge

Joseph A. Sanzone (Sanzone & Baker, L.L.P., on brief), for appellant.

Matthew J. Beyrau, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

**MEMORANDUM OPINION BY**
**CHIEF JUDGE MARLA GRAFF DECKER**

Keon Jamir Palmer appeals his convictions for first-degree murder and use of a firearm in the commission of murder in violation of Code §§ 18.2-32 and -53.1. He contends that the trial court erred by excluding a social-media video of the victim engaged in a fight with a third party and by ruling that the evidence was sufficient to prove he acted with premeditation. We hold that Palmer waived his challenge to the admissibility of the video. We also conclude that the evidence proved premeditation. As a result, the challenged convictions are affirmed.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND[2]

On February 21, 2024, Keon Jamir Palmer shot and killed Makayvia Cabell. At the trial that followed, the jury rejected his claim of self-defense and convicted him of first-degree murder and the related use of a firearm.

The evidence at trial established that Palmer and Cabell had a romantic relationship while the two were living in the Lynchburg home of Palmer's mother during the first half of 2023. Also living in the home was Palmer's younger brother Mekhi.

Palmer and Cabell's relationship deteriorated into "chaos" and "arguments." In July 2023, Palmer moved to Charlottesville to live with his father. Cabell also moved out of Palmer's mother's home.

In February 2024, Palmer returned to his mother's home. On February 20, the day before the murder, he invited Cabell to visit, and she stayed overnight. The next morning, the two argued. While Palmer was in his mother's bedroom and Cabell remained in the living room, the two engaged in a lengthy exchange of Instagram messages during which Palmer both said he would commit suicide and also threatened to kill Cabell. Shortly before 10:00 a.m., he messaged her and asked her to have sex with him "one last time." He also said she could "have th[e S]mit[h & Wesson pistol] back when [he was] gone." Cabell messaged him to "[c]hill out." During additional exchanges, Palmer told her multiple times to leave the house.

---

[2] The appellate court "review[s] the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Commonwealth v. Barney*, 302 Va. 84, 96 (2023) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). Considering the evidence in this light requires the reviewing court "to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn []from [that evidence].'" *Tomlin v. Commonwealth*, 302 Va. 356, 361 (2023) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018) (per curiam)).

Palmer eventually messaged Cabell that she should leave before he used a knife to kill her. She replied that he "ke[pt] getting [her t]here and kicking [her] out." Palmer called her a "[b]itch" and said he had been "looking out for [her]" because she had "no[]where [to] sleep." Cabell messaged him to leave her alone, saying her social worker would find lodging for her soon. Palmer replied that he would keep "popping" pills until she left.

About 10:15 a.m., Palmer entered the living room, and Cabell videoed their exchange with her phone. Palmer gave her some cash, produced a Smith & Wesson pistol, and tossed it toward Cabell where she sat on the couch. He told her to take the pistol "because [he] d[id]n't need it [any]more" and to "get out." He then went back into the bedroom. Cabell could be heard in the video commenting that Palmer had "picked [the pistol] up like he was about to shoot [her]."

In additional Instagram messages, Palmer "begg[ed]" Cabell to leave, saying, "You got your li[tt]l[e] gun," and offering her more money "to get . . . out." He then changed the focus of his messaging, saying, "[I]ma shoot you cause you got a gun and you['re] in my house." Palmer continued that he did not want her there because she was a "threat." He added that he did not "trust [her]," was "scared," and "fear[ed] for [his] life." He followed up with, "Get out," and, "I'm not try[ing to] put my hands on you." Cabell messaged back, "You need help." In response, Palmer said he would "be fine."

Shortly thereafter, Palmer returned to the living room, and he and Cabell resumed arguing. Palmer again told her to leave. He threw Cabell's purse and other personal items out of the house. According to Mekhi and Palmer, as Palmer grabbed Cabell's belongings, she "pulled" the pistol, stood up, pulled the slide back, and pointed it "[d]irectly at" Palmer. The two men added that Cabell said she "ha[d] nowhere to go" and was not leaving. She then sat back

- 3 -

down, put the pistol down, and picked up her phone and a flashlight-style taser. She held these items in her hand while the gun remained beside her on the couch.

Palmer reacted by pulling down the retractable attic stairs, climbing up to the attic, and getting a larger gun, an AR-style rifle, before returning to the ground floor. He "paced back and forth" in the living room with the rifle and then carried it into the adjoining kitchen. Cabell was still sitting on the couch, facing away from the kitchen and toward the front door.

According to Mekhi, a little less than a minute after Palmer retrieved the rifle, Palmer's "gun [went] off," firing "[m]ultiple" shots. The shots, which came from the kitchen, hit Cabell, causing her to fall off the couch. As Palmer ran out the back door, Mekhi "screamed . . . why would he do that."

Mekhi called 911. Cabell was transported by ambulance to the hospital, where she was pronounced dead.

After the shooting, Palmer fled and called a friend in a panic, looking for a car. He also asked people on social media if they could give him a ride.

Law enforcement officers investigating the shooting found five cartridge cases from an AR-style rifle on the kitchen floor, indicating the rifle was fired from "the front area of the kitchen," fairly close to where Cabell was sitting. Palmer's fingerprints were found on the Smith & Wesson pistol, but Cabell's prints were not identified on that weapon. Social media photos from before the shooting showed Palmer holding what was believed to be the rifle with which he shot Cabell.

Cabell's autopsy reflected that she sustained seven gunshot wounds and that several wounds to her torso caused her death. Additional evidence showed the trajectory of the bullet holes into her body and the couch. A video and various photographs of the crime scene were admitted into evidence, showing the proximity of the kitchen to the couch. This evidence,

combined with Mekhi's testimony that Cabell was facing the front door when shot, proved that Palmer fired at least some of the shots at Cabell from behind, into her right shoulder and outside left thigh.

Palmer testified in his own behalf, contending that he shot Cabell in defense of himself and his brother, immediately after she said, "I've got something for you," and "started reaching" for the pistol. He made conflicting statements about his own possession of the gun that morning, however, admitting he possessed it only when confronted with Cabell's video of him giving the gun to her thirty minutes before the 911 call. According to Palmer, it belonged to her and he thought she was refusing to leave "because she wanted [it] back."

In an effort to bolster his claim of self-defense, Palmer testified about several previous incidents of Cabell's behavior that he said frightened him. One of them involved a video of her having a fistfight with his ex-girlfriend. When defense counsel sought to offer the third-party video into evidence, the prosecutor objected based on relevance and authentication. The court overruled the prosecutor's relevance objection, stating it would "allow [the video], *subject to authentication*." (Emphasis added). Despite additional failed attempts by defense counsel to authenticate the video, it was never admitted into evidence.

Defense counsel made a motion to strike at the close of the Commonwealth's case and again at the close of all the evidence. Both times, he challenged the sufficiency of the evidence to prove Palmer acted with premeditation. The trial court denied both motions.

The court instructed the jury on first- and second-degree murder, including the element of premeditation, as well as voluntary manslaughter. The jury was also instructed on self-defense and additional legal principles that counsel referred to as the castle doctrine, permitting a person to use force in certain circumstances in his own home to "repel" someone who has assaulted him there.

Palmer was convicted of first-degree murder and use of a firearm in the commission of murder. He was sentenced to seventy-eight years in prison with twenty-three years suspended.

ANALYSIS

Palmer challenges the trial court's ruling excluding the social-media video of a prior fistfight between Cabell and a third party, offered to prove her violent tendencies. He also contends that the evidence was insufficient to prove that he acted with premeditation.

I. Waiver of Challenge to Admissibility of the Video

The Commonwealth argues that Palmer waived his appellate challenge to the trial court's ruling excluding the video. It suggests that Palmer, in his assignment of error and opening brief, mischaracterizes the trial court's ruling as being based on relevance and that he does not address the court's actual ruling, which was based on a failure to authenticate the social-media video. We assume without deciding that Palmer adequately assigned error under Rule 5A:20(c) to the trial court's ruling regarding the lack of authentication. *See Morris v. Commonwealth*, 77 Va. App. 510, 517 n.2 (2023) (en banc). But even so, we agree with the Commonwealth that Palmer failed to meet minimum briefing requirements on this particular legal point, thereby waiving the challenge under Rule 5A:20(e).

Rule 5A:20(e) requires that an opening brief contain "[t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error." It is well established that "[u]nsupported assertions of error 'do not merit appellate consideration.'" *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008), *aff'd in part and vacated in part on other grounds*, 279 Va. 52, 58-60 (2010)). This is so because "[i]t is not the role of the [appellate] court[] . . . to . . . construct a litigant's case or arguments for him." *Id.* at 746 (first alteration in original) (quoting *Sneed v. Bd. of Pro. Resp.*, 301 S.W.3d 603, 615 (Tenn. 2010)), *quoted with approval in Coward v.*

- 6 -

*Wellmont Health Sys.*, 295 Va. 351, 367 (2018); *see Cappe v. Commonwealth*, 304 Va. 86, 90-91 (2025) (per curiam). "'[W]hen a party's "failure to strictly adhere to the requirements of Rule 5A:20(e)" is significant,' this Court may treat the question as waived." *Conley v. Commonwealth*, 74 Va. App. 658, 681 (2022) (alteration in original) (quoting *Bartley*, 67 Va. App. at 744); *see Gilbert v. Commonwealth*, 87 Va. App. 472, 488 n.8 (2026); *Jeter v. Commonwealth*, 44 Va. App. 733, 740-41 (2005).

Here, the trial court made its ruling excluding the video on the basis that it was not properly authenticated. It clearly left the door open to admit the video if it was in fact authenticated. And despite the ruling regarding the video itself, evidence about it and its contents was admitted. The court permitted Palmer to testify about the social-media video and his knowledge of Cabell's violent character based on both his personal observations and seeing the video himself. These rulings concerning related evidence further confirm that the court excluded the video based on lack of authentication rather than relevance.

Palmer's opening brief focuses on the admissibility of the video on substantive grounds, explaining it was relevant to support his claim that the victim's prior acts of violence caused him to reasonably fear she would harm him. The brief does not mention "authentication" or the trial court's ruling on that basis. While the brief references "foundation," it fails to provide substantive argument or applicable case law. Palmer merely references that the court's ruling "limit[ed] the scope of the inquiry to a case [in] wh[ich] the defense can show who made the tape and when the tape was made" and that this was "an unreasonable requirement for foundation." He suggests that "[Cabell wa]s clearly shown in the tape and [Palmer] said that he knew of the tape," implying that this was adequate to support admission. But this is the extent of the brief's attempt to address the issue.

Regardless of this reference to foundation, Rule 5A:20(e) requires analysis and supporting authorities and permits a finding of waiver if the brief's failure to meet these requirements is "significant." *Conley*, 74 Va. App. at 681 (quoting *Bartley*, 67 Va. App. at 744). Palmer's opening brief provides no analysis of the claim that requiring proof of "who made the tape and when" was "an unreasonable requirement for foundation." Importantly, the brief also cites no case law, statutes, or rules of court relating to authentication or foundation to support this point. *See, e.g.*, Va. R. Evid. 2:901. Instead, the cases cited in the brief relate only to the *relevance* of the victim's character for violence, not to the method for *authenticating* a video purporting to show such violence. As a result, the brief does not comply with Rule 5A:20(e). But this does not end our consideration of the applicability of the rule, and we turn to an examination of whether the brief's failures are "significant."

Significant circumstances supporting a waiver exist when an appellant's "failure to provide legal argument and authority as required by Rule 5A:20(e) leaves [this Court] without a legal prism through which to view [the] alleged error." *Bartley*, 67 Va. App. at 746; *see Mitchell v. Commonwealth*, 60 Va. App. 349, 353 (2012); *see also Amazon Logistics, Inc. v. Va. Emp. Comm'n*, 304 Va. 107, 111-12 (2025) (per curiam) (analyzing the Supreme Court's similar rule to hold that waiver results when "an appellant makes a cursory argument . . . and fails to provide sufficient legal reasoning, factual analysis, or citations to authority" (quoting *AlBritton v. Commonwealth*, 299 Va. 392, 412 n.12 (2021))); *Cappe*, 304 Va. at 90 (holding that the appellant waived his right to challenge this Court's harmless-error determination because his claim was "unsupported by any argument" in his brief). In this case, we have been presented with no legal analysis on authentication or foundation.

We therefore hold that Palmer's failure on brief to provide legal argument on the authentication issue or cite any relevant legal authority is significant. Given the lack of

meaningful discussion of or citation to *any* authority specifically addressing the court's actual ruling that the video was inadmissible until properly authenticated, Palmer waived that particular challenge on appeal.

## II. Sufficiency of the Evidence

Palmer also challenges the sufficiency of the evidence to support his conviction for first-degree murder. Specifically, he suggests that the Commonwealth failed to prove premeditation.

### A. Standard of Review

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "[T]he judgment of the [fact finder] is presumed correct and will not be disturbed unless it is [']plainly wrong or without evidence to support it.[']" *Commonwealth v. Wilkerson*, 304 Va. 92, 100 (2025) (first alteration in original) (quoting *Garrick*, 303 Va. at 182); *see Cuffee v. Commonwealth*, ___ Va. ___, ___ (Apr. 16, 2026). "[I]t is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion." *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (second and third alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)); *see Commonwealth v. Richerson*, ___ Va. ___, ___ (Apr. 23, 2026). The question on appeal is "whether any rational trier of fact," in this case the jury, "could have found the essential elements of the crime beyond a reasonable doubt." *Cappe*, 304 Va. at 87 (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)).

Further, it is axiomatic that "any element of a crime[] may . . . be proved by circumstantial evidence such as a person's conduct and statements." *Seat v. Commonwealth*, 81 Va. App. 752, 762 (2024) (quoting *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011)). "[C]ircumstantial evidence is competent and is entitled to as much weight as direct evidence

provided that [it] is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Hughes v. Commonwealth*, 87 Va. App. 136, 148 (2026) (first alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). And firmly established in our case law is the principle that the jury, not the appellate court, "determines which reasonable inferences should be drawn from the evidence[] and whether to reject as unreasonable the [defendant's] hypothes[e]s of innocence." *Wilkerson*, 304 Va. at 102-03 (quoting *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017)). The reasonable-hypothesis principle "requires . . . [an] acquitt[al only] when the evidence provides no reasonable basis for a factfinder [to] choos[e] between [guilt and innocence as] equally likely options." *Cuffee*, ___ Va. at ___. Before the principle is applied, the factfinder, here the jury, determines the facts, including the credibility of the witnesses. *See Fary v. Commonwealth*, 77 Va. App. 331, 347 (2023) (en banc), *aff'd*, 303 Va. 1 (2024) (per curiam). In short, "[w]hether an alternate hypothesis of innocence is reasonable is a question of fact" for the jury, whose findings are "binding on appeal unless plainly wrong." *Commonwealth v. Mahoney*, ___ Va. ___, ___ (June 11, 2026) (quoting *Cuffee*, ___ Va. at ___).

With these principles in mind, we turn to Palmer's challenge to the sufficiency of the evidence to prove that his killing of Cabell was premeditated.

### B.  First-Degree Murder and Premeditation

First-degree murder is "a malicious killing accomplished by a willful, deliberate, and premeditated act." *Turner v. Commonwealth*, 23 Va. App. 270, 274 (1996), *aff'd*, 255 Va. 1 (1997) (per curiam); *see* Code § 18.2-32. "To premeditate means to adopt a specific intent to kill . . . ." *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)). Like all other elements of the crime, whether the

killing was premeditated "is a question to be resolved by the [jury]." *Schmitt v. Commonwealth*, 262 Va. 127, 143 (2001).

Although proof of premeditation is a necessary element, the intent to kill "need not exist for any specified length of time . . . provided the accused had time to think and did intend to kill." *Kirby v. Commonwealth*, 50 Va. App. 691, 700 (2007) (quoting *Remington*, 262 Va. at 352). Instead, premeditation may involve "an intent to kill that . . . exist[s] only for a moment." *Jackson v. Commonwealth*, 267 Va. 178, 204 (2004) (quoting *Green v. Commonwealth*, 266 Va. 81, 104 (2003)); *see Giarratano v. Commonwealth*, 220 Va. 1064, 1074 (1980) (holding that having mere "seconds" to "deliberate" was sufficient).

## C.  Evidence Proving Palmer's Premeditation

The direct and circumstantial evidence introduced at trial was more than sufficient to support the jury's finding that Palmer acted with premeditation when he shot Cabell. *See Secret v. Commonwealth*, 296 Va. 204, 229 (2018) (holding that intent may be established using "circumstantial evidence [including] reasonable inferences . . . from proven facts" (quoting *Viney v. Commonwealth*, 269 Va. 296, 301 (2005))).

Palmer and Cabell had a tumultuous relationship. Just before the shooting, Palmer threatened suicide and begged Cabell at least ten times to leave his mother's home, where she had spent the previous night at his invitation. The former couple's exchanges were shown in a series of digital messages, all sent while they were in different rooms in the same house.

Over the course of the exchange, Palmer sent multiple messages expressly threatening to kill Cabell, which in and of themselves firmly support a finding of premeditation. *See Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013) (recognizing that a person's statements and actions are evidence of his intent). The first time, he said in three successive messages, "Leave[.] Now[.]  Before I get a knife and kill you[.]"  Then he gave Cabell a Smith & Wesson pistol.

Shortly thereafter, Palmer messaged Cabell that he was going to shoot her because she was in his house with a gun.

Adding to the evidence of premeditation shown in Palmer's messaging and behavior during that time were his actions that followed. While Cabell sat on the couch with the gun *he* gave to her, which was merely lying beside her, Palmer retrieved an AR-style rifle from the attic. His actions were significant. His retrieval of the rifle required several steps—pulling the attic door down from the ceiling, unfolding the ladder, climbing up to retrieve the weapon, and climbing back down. This series of actions clearly provided him with time for reflection.

When Palmer returned to the ground floor, he paced around the living room with the rifle, again providing him with time for thought and reflection. He did so even though by all accounts Cabell was no longer holding the pistol. He then fired not just one but at least five shots at her from fairly close range near the front of the kitchen as she sat on the living-room couch, with what he admitted was a "big-ass gun." *See Kirby*, 50 Va. App. at 701 (observing that firing more than once and shooting a victim "at close, and thus predictably fatal, range" is evidence of premeditation (quoting *Jackson v. Virginia*, 443 U.S. 307, 325 (1979))); *Avent*, 279 Va. at 208 (stating that a jury evaluating premeditation "may properly consider the brutality of the attack" (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982))). The bullets entered Cabell's body from the rear and left side. This positioning, coupled with the fact that she was not holding a firearm at the time, supported a finding that Cabell was not a direct threat to Palmer when he shot her several times and killed her.

Palmer's attack was a brutal one, and rather than showing remorse, he immediately engaged in efforts to avoid detection by fleeing his mother's house and asking for help to escape. *See Avent*, 279 Va. at 208.

Although the Commonwealth was not required to prove a motive, the record included evidence of Palmer's possible motives for premeditated murder, either separately or in combination. *See Epperly*, 224 Va. at 232 (recognizing that motive is "often most persuasive upon the question of the actor's intent"). Palmer was angry with Cabell for not leaving his mother's house. Additionally, his statements in a phone call from jail indicated that he might have been upset with her for refusing to reconcile and move with him to Charlottesville. Either or both provided possible explanations for why he intended to shoot Cabell and did so.

Palmer contended at trial that he was afraid of Cabell when he pulled the trigger on his rifle because she said "she had something for [him]" and was reaching for the pistol. He maintained that he shot her because he "didn't want to get shot" and "was defending [him]self and hi[s brother]." He also suggests on brief that he fired "while [he remained] in an excited state," without the specific intent to kill her. The jury, however, was not required to accept this testimony or argument, especially in light of Palmer's conflicting statements at trial. *See Sheppard v. Commonwealth*, 250 Va. 379, 389 (1995) (holding that the "defendant's contradictory statements" supported the inference that he lied "'in an effort to conceal his guilt'" (quoting *Toler v. Commonwealth*, 188 Va. 774, 782 (1949))). During his testimony, Palmer initially claimed that the first time he saw the pistol was when Cabell pointed it at him that morning. But only Palmer's fingerprints were identified on the gun and when he was confronted with Cabell's video of *him* giving the pistol to *her* before that event, he changed his story to claim that he had taken it from her when she first arrived at his house.

This evidence supports a finding that Palmer gave the pistol to Cabell that morning to provide possible legal justification for his plan to eventually shoot her with the rifle that was secreted in the attic. *See Secret*, 296 Va. at 229 ("[T]he fact finder [may] infer that every person intends the natural, probable consequences of his . . . actions." (quoting *Commonwealth v.*

- 13 -

*Perkins*, 295 Va. 323, 330 (2018) (per curiam))). He claimed that he thought Cabell was refusing to leave "because she wanted the [hand]gun back" so he gave it to her. But the jury, of course, was free to reject Palmer's statements in whole or in part and again conclude that he was lying to conceal his guilt. *See Lambert v. Commonwealth*, 298 Va. 510, 515 (2020); *Washington v. Commonwealth*, 75 Va. App. 606, 616 (2022). This was especially true in light of his decision to testify, permitting the jury to assess his credibility directly. *See Sample v. Commonwealth*, 303 Va. 2, 16 (2024); *Fary*, 77 Va. App. at 347.

Finally, Palmer argues that the castle doctrine compelled his acquittal because it "allows a premedi[t]ated plan to protect oneself from attacks within one's home."[3] He suggests that a resident can "use whatever force [he] deem[s] necessary and reasonable even if death results." He relies on "direct evidence from [himself]" to argue that his use of lethal force against Cabell was justified as a matter of law. We disagree with Palmer's reliance on the castle doctrine.

The jury was instructed that when an individual "assaults a . . . resident in [his] own home, th[e] assaulted party has the right to use whatever force [is] necessary to repel the aggressor even . . . the taking of life." Jury Instr. 31;[4] *see Hines v. Commonwealth*, 292 Va. 674, 679-80 (2016) (requiring proof of "an overt act . . . [creating] an immediate threat to safety" and a degree of force that was "'absolutely necessary to repel'" that threat (quoting *Fortune v. Commonwealth*, 133 Va. 669, 687 (1922))). Applying the castle doctrine, which is a form of self-defense, requires findings of fact by the jury. *See Hines*, 292 Va. at 679; *Gilbert*, 87 Va. App. at 490. Here, the jury was instructed on the legal principles. But it simply was not required to believe Palmer's testimony that Cabell assaulted him by pointing the pistol at him

---

[3] We assume without deciding that Palmer's assignment of error challenging the sufficiency of the evidence to prove premeditation is broad enough to encompass his claim that the castle doctrine justified his shooting her. *See* Rule 5A:20(c); *Morris*, 77 Va. App. at 517 n.2.

[4] The jury was also instructed on what qualifies as an assault. *See* Jury Instr. 32.

- 14 -

earlier in their argument or that his use of lethal force was "necessary to repel" an imminent threat she posed when he later shot her multiple times with his rifle and killed her. *See Sample*, 303 Va. at 16; *Hines*, 292 Va. at 680. The jury's rejection of his testimony is clearly reflected by the fact that it convicted him of first-degree murder, negating his claim that the killing was justified by the castle doctrine or any other form of self-defense.

The evidence, viewed under the proper standard, supports the jury's finding that Palmer acted with premeditation when he shot Cabell at least five times from the rear at fairly close range, at a time when she was not holding a lethal weapon and was simply refusing to leave his mother's home.

## CONCLUSION

Palmer waived his challenge to the trial court's ruling excluding his proffered social-media video of Cabell fighting with a third party. Additionally, the evidence supports the jury's finding that Palmer acted with premeditation when he shot and killed her. As a result, this Court affirms his convictions.

*Affirmed.*